H. L. Roberts v. Commissioner.
H. Roberts v. Commissioner
Docket Nos. 13393, 13464.
United States Tax Court
1950 Tax Ct. Memo LEXIS 220; 9 T.C.M. (CCH) 318; T.C.M. (RIA) 50084; April 10, 1950
*220 The books and records of petitioner are found to have been sufficient from which to determine with reasonable accuracy his gross income and deductions, and it is held that his returns filed for the taxable years were correct. Robert Ash, Esq., Munsey Bldg., Washington, D.C., and Carl F. Bauersfeld, Esq., for the petitioner. J. C. Maddox, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: These consolidated proceedings arise from respondent's determination of deficiencies in income tax and fraud penalties for the years 1940 to 1945, inclusive, as follows: Income Tax
Docket No.
Year
Deficiency
50% Penalty
13393
1941
$ 6,183.31
$3,091.66
1942
3,388.68
1,694.34
1943
6,336.17
3,168.09
13464
1940
430.56
215.28
1944
2,245.32
1,122.66
1945
13,532.17
6,766.09
The issues presented are: (a) the correctness of petitioner's report of income for the calendar years in question; (b) if income for any of those years is understated, whether this was done fraudulently and with intent to evade tax; and (c) if income for the years 1940 and 1941 was understated but without fraudulent *221 intent, whether the collections of deficiencies for those years are barred by the statute of limitations. Findings of Fact Petitioner is an individual residing on Route 4, a short distance from Roanoke, Virginia. His returns for the periods here involved were filed with the collector of internal revenue for the district of Virginia, at Richmond, Virginia. Petitioner was born March 26, 1886, on a farm near Christianburg, Virginia, about 30 miles west of Roanoke, and his first employment was in the coal mines near that point. In 1904 the petitioner began working as a section hand for the Norfolk & Western Railroad at $1.10 a day. After about six months of this employment he was made a fireman by the Norfolk & Western Railroad and continued as such until 1913. As a fireman he received $100 per month in salary. In 1913 he was promoted to traveling fireman, which is a foreman over firemen of a particular railroad division. In 1916 he was promoted to locomotive engineer, but continued his work as traveling fireman. In 1918 he was promoted to fuel supervisor or assistant road foreman of engineers. In this position he was in charge of the engineers and firemen of the division, his *222 compensation being $270 per month and expenses while away from home. During the period from 1910 to 1913, while petitioner was a fireman for the Norfolk & Western Railroad, his run was made every other day. On the off days in each week he operated an automobile-for-hire business, with two fivepassenger Chalmers automobiles, which he had acquired, one driven by himself and the other by an employee. This business was so profitable that in 1913 he took leave from the railroad for a period of about six months and devoted his full time to his automobile business. At the end of this six months he returned to work for the railroad in order not to lose his seniority rights. Petitioner was married to his first wife in 1906. There was one son by this marriage. His wife died in 1913 and he was remarried in 1919. At the time of his second marriage his wife was employed as secretary to a doctor in Roanoke, Virginia, earning $15 a week. She continued in this work for a period after her marriage to petitioner. Petitioner finally left the employ of the Norfolk & Western Railroad in 1922, to go into the heavy hauling or dump truck business on his own account. At that time he purchased a Garford *223 truck at a cost of $4,500. By 1925 he owned 10 or 12 Garford trucks of a value of approximately $4,500 each. Between 1922 and 1925 petitioner, in addition to his heavy hauling business, engaged in a retail coal business with one Jenson for a period of about one year. In this business coal was bought in carload lots and retailed in smaller quantities. In 1925 petitioner acquired half the stock in a corporation known as the Automotive Sales Company. As consideration he transferred to that company all of his trucks except two, which he kept and operated individually. He became the vice-president of the corporation, at a salary of $350 per month. The corporation was engaged in the sale of Paige and Jewett automobiles and Garford trucks, and in addition carried on a trucking business. It had a fleet of 23 trucks, and petitioner was in charge of the hauling and trucking part of the business. The stock acquired by petitioner in the Automotive Sales Company was of a par value of $22,500. After about one year with the Automotive Sales Company, petitioner became dissatisfied and withdrew, transferring his stock in the corporation to certain of the other stockholders in exchange for five *224 new Garford trucks of a value of $4,500 each and a new Jewett automobile valued at $1,500 to $2,000 and a parcel of real estate which he sold for $1,400. Upon petitioner's withdrawal from the Automotive Sales Company in 1926, he continued in the hauling and trucking business and in that year moved his fleet of trucks and equipment to Jacksonville, Florida, to work for James Stewart & Company, which operated a large construction business and extensive building operations at Jacksonville. At this time petitioner's fleet consisted of nine trucks and four trailers. This Florida venture lasted approximately one year and was quite profitable. Petitioner, prior to that time, had lived in rented rooms, paying from $10 to $15 per month. After going to Florida, petitioner, for the first time, rented a house for himself and his family. He and his family have always lived frugally. At the conclusion of his work in Jacksonville, petitioner, in 1927, returned to Roanoke, Virginia, and there continued the hauling and trucking business until 1929, at which time considerable competition in that line of business developed, and petitioner transferred his activities to the operation of a rock crushing *225 business. At this time there was a large demand for crushed stone, due to a road building program of the state and county and the construction of streets by the City of Roanoke. Petitioner started in the rock crushing business with one rock crusher. He acquired his stone on a royalty basis and the business was very profitable. He increased his equipment to the point where, in 1934, he owned the following: 10 trucks, four rock crushers, several electric motors, two Sullivan air compressors, an automatic sharpener, three steam shovels and one gasoline shovel, a pump on a trailer, several thousand feet of pipe, six drills and certain necessary steel. In 1934 the petitioner decided to retire from active business. In addition to the equipment above set out, he had at that time several thousand tons of stone on hand. Following his retirement, he sold this equipment and the stone. Most of the equipment was sold prior to 1938. Petitioner had purchased a home near Roanoke, Virginia, in 1927, upon his return from Florida. He later acquired certain lots adjacent thereto, together with some nearby acreage property. In 1931 petitioner built a swimming pool at his home. This was intended for *226 the use and pleasure of his family and friends, but the number of persons using it became so large that petitioner, faced with the necessity of maintaining a life guard and chlorinating the water, decided to make it a public swimming pool with an admission charge. He thereupon built bath houses and a filtration plant and employed a girl as a ticket seller. He built a lunch stand at the pool and rented it to an operator. The regular charge to persons using the pool was 10 cents for children and 15 cents for adults, unless a locker or dressing room was used, when the charge was 15 cents for children and 25 cents for adults. No charge was made for the use of the pool by many churches and charitable organizations. During the six taxable years the pool, known as the Lee-Hy Swimming Pool, was operated as a public swimming pool, and in each year some of petitioner's income was derived therefrom. In 1936 petitioner purchased a property known as the Lakeside Amusement Park for a consideration of $50,000. Of this amount petitioner paid $12,000 in cash and conveyed a piece of property at a value of $13,000. The balance of the purchase price, in the sum of $25,000, was borrowed from the Mountain *227 Trust Bank of Roanoke, Virginia, secured by a mortgage on the property. Upon acquisition of this property petitioner incorporated the Lakeside Swimming Club, Inc. The property was conveyed to this corporation, petitioner receiving in exchange its capital stock plus a mortgage for $25,000. The corporation assumed liability for the payment of the $25,000 mortgage held by the bank. Petitioner, later in this year, acquired personally from the bank $10,000 of the first mortgage notes secured by this mortgage, and in 1943 or 1944 he purchased the balance of the mortgage in the sum of $15,000, thereupon becoming the owner of the entire $50,000 mortgage indebtedness. Petitioner has been president of the Lakeside Swimming Club, Inc. since its organization, and for the year 1936 received a salary of $3,000. Since that year he has received no compensation as president of the corporation nor has it paid a dividend. Following the acquisition of this property by petitioner, he expended $5,000 of his funds in repairs and improvements to the park. He also owned, individually, various rides or amusement devices which were placed in the amusement park owned and operated by the Lakeside Swimming Club, *228 Inc. The revenue from these amusement devices went to the corporation, petitioner individually receiving no part thereof. His income from the operation of the amusement park in the taxable years consisted of the interest paid by the corporation on its indebtedness to him and a percentage of the receipts from certain concessions at the park operated by one Waid. Both the Lakeside Amusement Park and the Lee-Hy Swimming Pool were seasonal operations, being open from about the first of May to the first of September each year. In 1943 the swimming pool was closed on August 15 because chlorine could not be obtained, and in 1944 was closed on July 31 because of the prevalence of infantile paralysis. Amounts paid by petitioner for wages to the girl who sold tickets and the life guard were paid by cash, as were payments for labor in connection with the pool. These payments for the taxable years were in the following amounts: 1940
$735.00
1941
766.50
1942
939.00
1943
861.00
1944
605.00
1945
861.30
In the operation of the Lee-Hy Swimming Pool, petitioner employed a girl to sell tickets and she was provided with a cash register upon which each sale was registered. *229 At the end of each day the receipts were totaled and sealed in an envelope with the amount written on the outside and were delivered to petitioner or his wife at his home. At the end of the week petitioner opened the envelopes and verified the amount in each with the figures marked on the envelope and, for the taxable years with the exception of 1945, the amount for the entire week was entered upon petitioner's account book. In 1945 the amounts were entered upon a monthly basis. The amount received as rent for the refreshment stand at the pool was paid in a lump sum at the close of the season, and thereupon entered in the book, as was the total amount paid for salary and labor. The amount due petitioner from Waid for the operation of eight concessions at the Lakeside Amusement Park was paid to petitioner, periodically, by check when the cash register at each of the concessions was read by the petitioner's oldest son. Petitioner kept a record of each check as received and entered the total in his account book at the end of the year. Petitioner, during the taxable years and prior thereto, has spent his winters with his family in Florida, the Lee-Hy Swimming Pool and the Lakeside Amusement *230 Park being closed. He has on each occasion taken his family to Hollywood, Florida, in a house trailer, the average cost of the trip each way being $20.50. In Florida he and his family have made their home in the trailer, parked in some trailer court at a small weekly charge. Their meals have been prepared by petitioner's wife in the trailer during their Florida stay. While in Florida petitioner never attended the horse or dog races. He does not drink or smoke. His one amusement in Florida was playing shuffleboard at a community center nearby. Petitioner and his family have always lived frugally, his personal living expenses in none of the taxable years being in excess of $2,500. Petitioner has saved money consistently through the years ever since he was first employed. He is not well educated, having only finished the fourth grade at school. He has always been distrustful of the solvency of banks, and for many years it was his custom to accumulate his savings in a small safe in his home or to bury them in a glass jar at some point near his home. He maintained bank accounts, but only in an amount necessary to cover necessary checks. If his bank account became, in his opinion, too *231 large, it was his custom to withdraw a portion and place it in his home safe or the glass jar referred to. Some time prior to the taxable years, petitioner rented a safe deposit box at his bank and, after that time, while at home, kept most of his cash on hand in this box. From time to time, as money accumulated in his savings, he would take smaller bills and obtain large bills for them. In 1938 petitioner had in his safe deposit box something in excess of $60,000 in cash. Of this, $15,000 was sealed in each of four envelopes on the outside of which was written one of the names of his four children. It was thought by petitioner that upon his death this would be sufficient to pass title to the money to each child. In the fall or winter of 1939, petitioner, on taking his family to Florida, removed $62,000 in cash from his bank box and carried it with him in a money bag in his trailer. He had some plans with respect to buying some Florida real estate. However, in that winter he made no such investment, and brought the money back to Roanoke and replaced it in his safe deposit box. This cash was represented by one $10,000 bill, six or more $5,000 bills, and the balance in denominations *232 of $100 or less. During the winter season of 1940-41, petitioner again took the $62,000 in currency to Florida and again made no investments, but returned with it to Roanoke. In the following winter he again took this cash, and while in Florida purchased a residence costing $13,177.30, payment being made in cash by him from the sum above mentioned. In the following year while in Florida he purchased certain unimproved places of property at Hollywood, Florida, at a total cost of $6,122.70, which were paid for from these funds which he had accumulated prior to 1940. During the years 1940 to 1945, inclusive, the petitioner purchased United States Bonds in the total amount of $8,500. Bonds in the amount of $3,750 were paid for by check, the remainder being paid for in cash from the money in his bank box accumulated prior to 1940. The returns filed by the petitioner for years prior to 1930 were destroyed by the Government, as were the returns for 1935 and 1936, and accordingly are not available. His returns filed for the years 1930 to 1934, inclusive, and 1937 to 1939, inclusive, show gross and net income as follows: Year
Gross Income
Net Income
1930
$32,925.98
$ 7,430.07
1931
73,897.41
16,259.81
1932
27,873.60
3,153.39
1933
35,584.06
4,808.18
1934
44,421.53
9,772.39
1937
6,553.07
4,595.04
1938
8,500.00
6,177.47
1939
3,984.95
1,515.57
*233 Petitioner's income for the years 1940 to 1942, inclusive, was recorded in a small graybacked account book. For these years his returns were audited by one Smith, an internal revenue agent. Petitioner turned over to Smith this account book and his check stubs, checks and bank statements for those years. As a result of this audit no deficiency was determined for any of the years, but Smith advised petitioner that the records kept by him were insufficient. As a result of this advice petitioner requested Smith to select for him a record book in which he should note his receipts and disbursements. The petitioner and Smith thereupon went together to a bookstore in Roanoke where a selection was made of an account book known as "Greenwood Approved Business and Income Tax Record." For the succeeding years petitioner recorded income and allowable deductions in this book. He is not a bookkeeper or accountant and, although the book was ruled for the daily entry of receipts, petitioner entered those from the Lee-Hy Swimming Pool by weeks. His receipts from rental of the lunch stand at the Lee-Hy Swimming Pool were entered at the end of the season, when paid. At the end of the season he also *234 entered the total of his disbursements for labor and salaries. In each of the taxable years, petitioner's returns were prepared for him by a certified public accountant from a summary, setting out the total income received, given him by petitioner from his books. Subsequent to the close of the last of the taxable years, another revenue agent was assigned to the audit of petitioner's returns, including those heretofore audited by Smith. To this agent petitioner turned over all of his records, including the Greenwood account book, but at some time during the audit by Smith or in the interval between that audit and the second audit, the small gray-backed account book had been lost or mislaid. Upon examination of the aforementioned records, a special agent, one Harold G. Riley, assigned to make the investigation, concluded that the records kept by petitioner were insufficient to determine his correct gross and net income. As a result the special agent reconstructed a gross and net income from other sources. The system of "increase in net worth" was not used, but a hybrid system consisting of including in gross income not only the income reported by the petitioner for each of the taxable *235 years, but also all bank deposits made by him which could not be identified from existing records, as representing reported income, plus expenditures made by petitioner in investments in real estate and bond purchases throughout those years, together with an amount estimated by the special agent as the cost to petitioner of his household expenses for each of the years. In determining income from each year upon this basis, the special agent disregarded petitioner's advice to him that prior to 1940 he had, in addition to money deposited in his bank accounts, the sum of $62,000 in cash. This fact was disregarded as being incredible of belief. For the taxable years petitioner reported gross and net income as follows: Year
Gross Income
Net Income
1940
$11,140.00
$ 7,601.88
1941
12,563.96
9,803.18
1942
10,253.00
6,585.63
1943
5,987.85
2,715.51
1944
7,699.40
4,918.14
1945
9,727.21
6,298.33
The stated gross income as set out above, the special agent increased for the several years in the following amounts: 1940
$ 2,635.00
1941
17,167.80
1942
10,207.00
1943
17,488.64
1944
7,779.34
1945
28,405.66
During the taxable years *236 the records maintained by petitioner of income and expenditures were not as complete and in such detail as they should have been, but were sufficient to determine with reasonable accuracy his gross income and net taxable income for those years. The gross and net incomes reported by petitioner for each of the taxable years were correct and the returns were not false or made with intent to evade tax. Opinion The principal issue is upon the correctness of the returns of petitioner for the several taxable years. If this issue is resolved in favor of the petitioner, the fraud issue falls and the issue with respect to the statute of limitations becomes moot. This issue involves only a question of fact. Our determination that petitioner reported with reasonable correctness his income for the years in question is, we think, amply supported by the record. The deficiencies in question were determined upon the basis of an investigation made by a special agent of the Bureau of Internal Revenue, and are based upon the assumption that the information given by petitioner as to his possession of $62,000 in cash prior to the taxable years was wholly false and incredible of belief. If his possession *237 of this cash is established, the respondent's case must necessarily fall. It is quite true that it is difficult to believe the statement that this large amount was accumulated in cash and so maintained without its deposit in bank. But it is not impossible of belief since it is a matter of common knowledge that many individuals are fearful of the solvency of banks and do at times maintain a large part of their capital in cash, secreted in some place they think is safe. Particularly is this so where, as here, such fact is established clearly and definitely by other than the word of the party in interest. The record here shows that petitioner had been continuously employed since he was a very young man, and had always saved money. For many years prior to the taxable years he had been in business for himself, realizing a very substantial income. At all times he had lived frugally. Until 1927 he had never owned a home and, with the exception of one year, had always lived with his family in rented rooms at a cost of $10 to $15 per month. That petitioner had amassed a very considerable amount in savings through the years is definitely established by the fact that at about the time of *238 his retirement from active business he purchased, at a cost of $50,000, an amusement park near Roanoke, Virginia, which was being sold under foreclosure. Of this purchase price he paid $25,000 in cash and property which he then owned. The balance of $25,000 was paid by borrowing that amount on first mortgage on the park property from a local bank. Later in the same year he purchased from the bank $10,000 of the mortgage notes secured by this mortgage, increasing his equity in the property to $35,000. After its acquisition, he spent $5,000 in repairs and improvements on this property. On acquiring this property he formed a corporation to which it was conveyed. In this exchange petitioner received all of its $5,000 of capital stock and a second mortgage for the $25,000 paid by petitioner on the purchase price of the property. The corporation assumed liability upon the $25,000 due the local bank. The taxable years are those following his retirement from active business. The record shows that following this retirement his sources of income were the interest on the indebtedness due him from the corporation owning the amusement park, a 30 per cent interest in the income from certain *239 concessions operated by one Waid at the amusement park, admission fees from a public swimming pool maintained at his home, and rental paid him annually on a lunch stand near this swimming pool. Outside of the interest income above mentioned, all of this income was from seasonal sources existing only four months in the year. Although during the tax years the petitioner was president of the corporation operating the amusement park, he received no salary and the corporation paid no dividend. There is no affirmative evidence that petitioner had any source of income other than those above stated or that the income from those sources was in excess of the amount reported. The special agent making the investigation appears to have predicated his finding on large amounts of income in each year from some secret source. Upon his discard of the information given him with respect to petitioner's large accumulation of income in past years kept in cash in his deposit box, the revenue agent has also, it appears, assumed that petitioner drew from some undisclosed source a very substantial amount not reflected in his bank deposits and used in taking his family to Florida, where they spent each winter. *240 The record is very convincing that petitioner's expenditures for the cost of maintaining his household were nowhere near the figure assumed by the special agent. The winter trips of petitioner and his family were made by trailer, in which petitioner and his family lived in Florida at some parking court at a small weekly rental. Petitioner's wife prepared the meals in the kitchen of the trailer. The household expenses of petitioner and his family while at their home near Roanoke were also very small. Petitioner's wife did all the housework, including cooking and canning preserves and vegetables. We think the record amply sustains petitioner's statement that his household expenses during the years in question never exceeded $2,500 a year. The principal question is whether petitioner possessed $62,000 in cash in 1939, the year prior to the first of the taxable years. With respect to this, the record clearly establishes that he did. The evidence shows that his various investments in the taxable years in the purchase of real estate and Government bonds were financed from this source and not from current income from some undisclosed source or the unreported income from investments at *241 Roanoke. One witness whose testimony was impressive stated that he had accompanied the petitioner to his bank in 1939 and had seen him count more than $60,000 in cash in his bank box, including one $10,000 bill, some five or six $5,000 bills and other bills of a lesser denomination. The head teller of a local bank at Roanoke, Virginia, testified that prior to 1940 he had procured a $10,000 bill for petitioner, together with bills of $5,000 in denomination, in exchange for smaller bills brought to the bank by petitioner. Three responsible disinterested citizens, one a real estate agent in Florida and the other two substantial business men with whom petitioner associated during several winters in Florida, also corroborated his statement that the $62,000 in question was in his possession in Florida in 1939 and subsequent to that time. Two of these individuals at one time had plans for the acquisition of certain properties in Florida in conjunction with petitioner, who showed them the cash he kept in the trailer. They confirmed positively the fact that it consisted of one $10,000 bill and some $5,000 bills, with others of lesser denominations. We are fully convinced that petitioner *242 possessed these savings in cash prior to the taxable years, and that the bank deposits he made in Florida in connection with the purchase or anticipated purchase of real estate in that state were made from this cash he carried with him from Roanoke, Virginia. We are also convinced that the war bonds purchased by petitioner and his $15,000 purchase of the remaining part of the $25,000 mortgage on the amusement park, held by a local bank, were from this source. The testimony of the special agent of the Bureau of Internal Revenue who made the audit upon which the deficiencies were determined was not convincing. On the other hand, the testimony of Clyde A. Brown, the certified public accountant who prepared the returns for the petitioner during the taxable years here and who made an audit of the petitioner's records following the determination of the deficiencies, impressed us as accurate and intelligent. The testimony of this witness sustained the accuracy of the returns as made and the fact that if any inaccuracy existed it was due to comparatively slight mathematical errors in the petitioner's addition of items of income or deductions which in some instances favored the petitioner *243 and in others were against him, the two classes of errors rather balancing one another. It is our conclusion that the returns filed by petitioner for the taxable years were correct. Decisions will be entered for the petitioner.